# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| JAIME HAWN, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19cv220-MRB-SKB |
| vs. | ) | |
| | ) | |
| | ) | Judge Michael R. Barrett |
| | ) | Magistrate Judge Stephanie Bowman |
| VITAS HOSPICE SERVICES, L.L.C., | ) | |
| Defendant. | ) | |

## DEFENDANT VITAS HOSPICE SERVICES, L.L.C.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Consistent with Fed. R. Civ. P. 56, Defendant Vitas Hospice Services, L.L.C ("Vitas" or "Defendant") respectfully moves this Court for summary judgment on all claims asserted in Plaintiff Jamie Hawn's Complaint. First, Plaintiff's equal pay claims fail as a matter of law because Plaintiff did not perform equal work to her prior supervisor, Andrew Gallimore, who had significantly more responsibility, and Vitas has articulated legitimate, non-discriminatory factors other than sex to justify the pay disparity.

Second, Vitas is entitled to Summary Judgment on Plaintiff's hostile work environment claim because Plaintiff failed to demonstrate an objectively or subjectively hostile work environment and Vitas took steps to prevent harassment. Third, Plaintiff's retaliation claims under ORC §4112.02 fail as a matter of law because Plaintiff cannot establish a *prima facie* case, refute Vitas' legitimate non-retaliatory reason for her termination, or demonstrate pretext.

Fourth, Plaintiff's whistleblower claims fail for the same reason as her retaliation claims under ORC §4112.02, and additionally Plaintiff failed to participate in whistleblower activity protected by the statutes. In support of its Motion, Vitas submits its accompanying Memorandum

of Law in Support of Its Motion for Summary Judgment, Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment, and the pleadings and deposition transcripts with accompanying exhibits attached.

## I.   STANDARD OF REVIEW

A party is entitled to summary judgment when "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment must be granted, because Vitas has established that the undisputed material facts support judgment as a matter of law. *Matshuhita Elec. Indus. Cp. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

## II.   LAW AND ARGUMENT:

### a.   Plaintiff's Equal Pay Claims Under 29 USC 206(d)(1) and ORC 4117.17 Fail as a Matter of Law.

Plaintiff's wage claims fail as a matter of law because she did not perform equal work as her alleged comparator, her salary disparity was based on a legitimate non-discriminatory factor other than sex, and they are partially time barred. The Equal Pay Act ("EPA"), and its Ohio counterpart, prohibit wage discrimination on the basis of sex. [1] To establish a *prima facie* case for an equal pay claim, a plaintiff must show unequal pay "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

If a plaintiff establishes a *prima facie* case, the defendant can still defeat the claim by establishing an affirmative defense to justify the disparity in pay. *Kovacevich v. Kent State Univ.*,

---

[1] The Ohio equal pay statute and the federal EPA are virtually identical. *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 754 (S.D. Ohio 2011). As a result, courts apply EPA standards to resolve claims under ORC 4117.17. *Id.*

224 F.3d 806, 826 (6th Cir. 2000). The affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than sex. *Id*. (citing 29 U.S.C. § 206(d)(1). Here, Plaintiff's EPA claims fail as a matter of law because: (1) Plaintiff and Gallimore did not perform equal work; (2) Vitas had a legitimate factor other than sex for the pay disparities; and (3) her claims are partially time barred.

### i. *Plaintiff's claims fail as a matter of law because Plaintiff did not Perform Equal Work as Gallimore.*

Because Plaintiff cannot establish that she and Gallimore performed equal work, Vitas is entitled to summary judgment as a matter of law. "Equal" work is work of "substantial equality of skill, effort, responsibility and worked conditions." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). In determining whether employees performed equal work, the Court must make an overall comparison of the work, not its individual segments. *Id.* Since "job titles are frequently of such a general nature as to provide very little guidance" in applying the EPA standard, it is "job content" that is controlling. *Clark v. Johnson & Higgins*, 1999 U.S. App. LEXIS 11350, at *10 (6th Cir. May 28, 1999) (holding that having similar executive titles does not establish similar work or level of responsibility).

Contrary to Plaintiff's assertions, Plaintiff did not replace her prior supervisor, Andrew Gallimore, or assume his job duties as Senior Director of the Business Process Improvement Center ("BPIC"). In fact, no one replaced Gallimore because Vitas eliminated his position as Senior Director of the BPIC. SOF ¶¶ 14–17, 19–20. As Senior Director of the BPIC, Gallimore had immense responsibility within the IT Department and for process change for all of Vitas, including:

1. Managing the BPIC and all process change throughout the entire company;

2. Managing the IT Department's Mobility & Interoperability ("M&I") group;
3. Managing the IT Department's Asset Management ("ASM") group; and
4. Managing at least eight (8) reports.

SOF ¶¶ 7, 18.

Unfortunately, Gallimore and the BPIC struggled in their performance and, despite assistance from senior leadership, their performance failed to improve. SOF ¶¶ 19–20. As a result, between January and June of 2016, Vitas began restructuring the IT Department and decided to eliminate the BPIC and Gallimore's position as Senior Director of the BPIC. SOF ¶¶ 19–20.

Vitas removed the M&I and ASM groups from the BPIC, and reassigned responsibility for those roles to other managers and directors in the IT Department. SOF ¶ 21. Responsibility for the ASM and M&I functions were a substantial portion of Gallimore's role, as it included responsibility for and management of over 20,000 Vitas devices, Vitas' operation software for admissions (which was a critical component of its business), and six (6) direct reports. SOF ¶¶ 7, 20, 24. Plaintiff did not assume responsibility for any of these roles. SOF ¶ 25.

Additionally, Vitas eliminated the BPIC, and eliminated the IT Department's responsibility for process change for the entire company. SOF ¶¶ 20–21. Vitas abandoned the idea for a central hub for process change for the company, and the responsibility for process change reverted back to the management of each department and/or business function. SOF ¶ 21.

In reality, Plaintiff only assumed a small fraction of the responsibilities of the Senior Director of the BPIC. SOF ¶¶ 25, 30. When Vitas eliminated the BPIC, it created the IT Project Delivery, Solutions & Finance ("PDSF") group to assist with process change for the IT Department. SOF ¶ 23. Plaintiff *split* the responsibility of managing the PDSF group with the Director of IT Project Management Office ("PMO") Leon Green. SOF ¶¶ 24–26.

4

Specifically, Plaintiff retained her prior Portfolio Management duties and assumed responsibility for supervising two (2) process engineers and one (1) business analyst in the PDSF group. SOF ¶ 25. Green assumed the remaining responsibility of the PDSF group, including six (6) direct reports. SOF ¶ 24. Chief Technology Officer ("CTO") Steven Smith took over Gallimore's responsibility of supervising Plaintiff and her Portfolio Management duties. SOF ¶ 26.

Clearly, Plaintiff's Director of IT Solutions position was not substantially equal in terms of skill, effort, and responsibilities as the eliminated Senior Director of the BPIC position. *Clark*, 1999 U.S. App. LEXIS 11350, at \*12 (holding employees do not perform "equal work" when they perform different tasks aimed at servicing different components of the business); *Flannery v. Riverside Research Inst.*, 2021 U.S. Dist. LEXIS 60640, at \*27 (S.D. Ohio Mar. 30, 2021) (holding overlap in some responsibilities does not establish equal work when the comparators' duties were larger in scope and they had additional responsibilities and reports).

Unlike Plaintiff's position, the Senior Director of the BPIC supervised the M&I and ASM groups, had eight (8) direct reports, and, most importantly, was responsible for process change *throughout* the company. SOF ¶¶ 7, 18. Alternatively, Plaintiff had fewer direct reports and a much narrower scope of responsibility, and, critically, Plaintiff had no responsibility for process change outside of the IT Department, and responsibility for process change in the IT Department was split between Plaintiff and Green. SOF ¶¶ 24–26, 30. As such, Plaintiff did not have nearly the level of responsibility as Gallimore, and did not perform equal work.

### ii. Plaintiff's claim also fails because Vitas paid her less based on a legitimate factor other than sex.

Even if she had performed significantly similar work to Gallimore, Vitas had legitimate non-discriminatory reasons for the pay disparity. The Sixth Circuit has recognized the following

factors as legitimate factors "other than sex" to justify a pay disparity: relevant work experience, education, different job levels, different skill levels, previous trainings, and prior salary. *See Balmer v. HCA, Inc.*, 423 F.3d 606, 611–12 (6th Cir. 2005) (citing *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1081 (8th Cir.1999); *Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995); *Pouncy v. Prudential Ins. Co*., 668 F.2d 795, 803 (5th Cir. 1982); *Harker v. Utica Coll.*, 885 F. Supp. 378, 390 (N.D.N.Y. 1995)). Consideration of a new employee's prior salary is also allowed, so long as the employer does not rely solely on prior salary to justify a pay disparity. *Id.*

In this case, Plaintiff was not entitled to the same level of compensation as Gallimore because: (1) she had significantly less director level experience than Gallimore; (2) she had significantly less experience in management, process change, and IT than Gallimore; (3) she did not have the same level of training or certifications as Gallimore; (4) she did not have the same level of prior earnings as Gallimore; and (5) the 8–9% raise that she received was in line with the average raise Vitas provided for promotions. SOF ¶¶ 28–29.

For example, prior to joining Vitas in 2014, Gallimore had received his Bachelor's Degree in Operations Management in 2000, had twelve (12) years of management experience in business analysis at Fifth-Third, had served as an organizational change consultant for two (2) years at Cardinal Solutions Group, and had served as a Director of Planning and Analysis change for two (2) years at Vantiv. SOF ¶ 31.  On the other hand, prior to joining Vitas in 2014, Plaintiff received her Bachelor's in Business Administration in June of 2013, had four (4) years of experience as a Sales Manager for Citigroup, had six (6) years of experience as a Senior Brokerage Specialist III for Fidelity, had less than one (1) year experience as a Sales Relationship Advisor at Fidelity, and had one (1) year of experience Operations Sales Manager at Vantiv. SOF ¶ 33.

Gallimore also had certifications in leading multi-level organizational change from SAFe, Scrum, and Six Sigma, which Plaintiff did not. SOF ¶ 32. As such, the significant difference in Plaintiff's management experience, process change experience, and certifications was a legitimate justification for the disparity in her salary. *Mallison v. Haworth, Inc.*, 2011 U.S. Dist. LEXIS 5666, at *15 (W.D. Mich. Jan. 14, 2011) (finding no "equal work" when the employee had less management and industry-specific experience); *Hunker v. Allied-Baltic Chem.*, 2006 U.S. Dist. LEXIS 107912, at *32 (N.D. Ohio Oct. 24, 2006) (holding differences in experience and professional certifications are sufficient to justify differences in pay).

Additionally, Plaintiff's salary was justifiably lower because Plaintiff had a significantly lower salary history and requested a lower salary at the beginning of her tenure at Vitas. *Briggs v. Univ. of Cincinnati*, 2020 U.S. Dist. LEXIS 178704, at *23 (S.D. Ohio Sep. 28, 2020) (citing *Engelmann v. Nat'l Broadcasting Co.*, 1996 U.S. Dist. LEXIS 1865, 1996 WL 76107, at *10 (S.D.N.Y. Feb. 22, 1996) ("Salary matching — payment of a higher salary to match an incoming employee's previous earnings — also is a valid reason for wage differences."); *Weber v. Infinity Broadcasting Corp.,* 2005 U.S. Dist. LEXIS 40724, at *13 (E.D.Mich 2005) ("Negotiation is a permissible factor other than gender to consider in determining wages.")

Vitas hired Gallimore after conducting an external national talent search to find someone who could lead the BPIC. SOF ¶ 6. At the time Gallimore left Vantiv, he was already a director making $122,000 salary, plus bonus and stock options, and he negotiated for a starting salary of $130,000. SOF ¶ 34. On the other hand, Plaintiff had no director-level experience, was making $70,000 salary, plus bonus, and only requested a salary of $90,000. SOF ¶¶ 30–34.[2] When Vitas

---

[2] Vitas did not believe that Plaintiff's Director of Portfolio Management position should even been a director level title, especially as she reported to a Director and had no reports. Smith Aff. ¶ 32. But, Gallimore insisted that Plaintiff receive a director level title. *Id.*

adjusted Plaintiff's salary in 2016 to account for her additional job responsibilities, Vitas followed its standard policy of providing an 8–9% raise for promotions. SOF ¶¶ 28–30. Thus, Vitas treated Plaintiff equally to other internal employees selected for a promotion when determining her salary adjustment, which is a legitimate non-discriminatory reason for a salary differential. *Briggs*, 2020 U.S. Dist. LEXIS 178704, at \*23 (citing *Lewis v. Oklahoma*, 42 Fed. Appx. 160, 172–73 (10th Cir. 2002)).

Most importantly, in setting Plaintiff's salary as Director of IT Solutions, Vitas wanted to ensure that Plaintiff's compensation was equivalent to the Director of IT PMO Green's compensation, who was her peer and was also a director of the PDSF. SOF¶¶ 26, 30. As Green was Plaintiff's closest comparator and had equal, if not more responsibility, Vitas had a legitimate, non-discriminatory justification in ensuring that they had comparable salaries. *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004) (upholding dismissal of an EPA claim when the Plaintiff received the same salary as her male counterparts). Notably, Vitas provided Plaintiff equivalent compensation as Green, a male employee, even though Green had more tenure and experience. SOF ¶ 29. As a result, there is no indication that Plaintiff received less favorable treatment on the basis of sex. For the reasons stated above, Plaintiff's EPA claims fail as a matter of law because Vitas had multiple legitimate, non-discriminatory reasons other than sex for the salary differential.

### iii. Plaintiff's Claims under ORC 4117.17 are Time Barred and Plaintiff's EPA Claims are Partially Time-Barred.

Moreover, Plaintiff's claims under the ORC 4111.17 are time barred. The statute of limitations for an Ohio equal pay claim is one year. Ohio Rev. Code § 4111.17(E). Plaintiff alleges that she was paid less than Gallimore for similar work, while in the Director of IT Solutions role. However, Plaintiff left that role in October of 2017 and transferred into a new role, with new job duties, in a new department. SOF ¶ 58. Thus, any alleged unequal pay violations would have ceased

in October of 2017 when she transferred into a different role. Yet, Plaintiff did not file her Complaint until February of 2019. *See generally* Compl. Thus, Plaintiff's Ohio unequal pay claims are untimely. Likewise, Plaintiff's claims under 29 USC 206(d)(1), which has a two year statute of limitations, are time barred to the extent any action occurred prior to Feburary of 2017. 29 U.S.C.S. § 255 (providing a two years statute of limitations).

### b. **Plaintiff's sexual harassment and hostile work environment claims under ORC 4112.02 also fail as a matter of law because Plaintiff was not subjected to a harassing or hostile work environment.**

Plaintiff cannot establish that she was subjected to a hostile work environment during her employment at Vitas.[3] To establish a hostile work environment claim, an employee must establish that: (1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on the employee's sex; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. App'x. 436 (6th Cir. Oct. 20, 2008).

In this case, Plaintiff's claims fail as a matter of law because: (1) the alleged harassment did not constitute a hostile work environment and Plaintiff was not even aware of the allegedly harassing behavior until after her transfer; (2) there is no evidence that the allegedly harassing behavior was based on her sex; and (3) Vitas exercised reasonable care to prevent and remedy any sexually harassing behavior in its workplace. For these reasons, Plaintiff cannot establish a *prima facie* case of hostile work environment based on sex and her claim fails as a matter of law.

---

[3] Plaintiff does not allege that she was subjected to *quid pro quo* harassment.

### i. Even if true, the allegedly harassing behavior does not approach anywhere near the standard to establish a hostile work environment.

Assuming that Plaintiff's allegations are true, the behavior alleged does not rise anywhere close to the standard for establishing a hostile work environment. To establish a hostile work environment, the environment "must be severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 24 (1993) (internal citations omitted). A hostile work environment "must be permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Coulson v. Goodyear Tire & Rubber Co*., 31 F. App'x 851, 852 (6th Cir. 2002). To succeed on a sexual harassment claim, a Plaintiff must show that their working environment was objectively and subjectively hostile. *Clark v. v. United Parcel Service, Inc.,* 400 F.3d 341, 351 (6th Cir. 2005).

In this case, Plaintiff claims that she was subject to a hostile work environment while working in the IT Department because allegedly she heard rumors, after she left the IT Department, that: (a) on one occasion a female employee referred to her as a bimbo; (b) her colleagues made fun of her verbosity and competence behind her back; and (c) that someone stated that she was only still employed because she was sleeping with the CEO and other members of IT leadership. Compl. at ¶ 10. However, even if the rumors were true, Plaintiff admits that she did not know about any of the alleged misconduct until after she had already transferred out of the IT Department, and that Human Resources promptly investigated the allegations after she complained. SOF ¶¶ 45, 47–57. As explained below, Plaintiff simply cannot meet the standard to establish a *prima facie* claim of hostile work environment and Vitas can establish the affirmative

defense that it was not aware of the conduct and, as soon as it became aware, it took immediate steps to prevent further harassment.

> ### ii. Plaintiff was not subject to any harassment and did not experience a hostile work environment because she was not even aware of the allegedly harassing conduct until after she transferred.

Plaintiff's hostile work environment claim fails as a matter of law because Plaintiff was not actually subjected to any harassment, and Plaintiff was not even aware of the allegations until after she transferred out of the department. To support a claim of harassment, a Plaintiff must have been aware of the allegedly harassing comments while in the work environment. *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 262 (6th Cir. 2001). An employee cannot allege that the work environment was subjectively hostile based on conduct of which she was not aware. *Kerecman v. Pactiv Corp.*, 2007 U.S. Dist. LEXIS 19088, at *47 (S.D. Ohio Mar. 19, 2007).

As an initial matter, Plaintiff does not allege that any Vitas employee subjected her to unwanted sexual conduct. For example, Plaintiff does not allege that any person sexually propositioned her, subjected her to unwanted touching or sexual conduct, or sent her sexually explicit photos or communications. Instead, Plaintiff merely alleges that she heard rumors that her colleagues made fun of her behind her back.[4]  This is insufficient to establish a hostile work environment. *Messer v. Ohio*, 2013 U.S. Dist. LEXIS 14730, at *42–43 (S.D. Ohio Jan. 31, 2013) (holding that plaintiffs failed to show that they were exposed to a severe and pervasive work environment because, in part, the comments the plaintiffs alleged were learned of second-hand); *Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst.*, 496 F. App'x 558, 565 (6th Cir. 2012) (holding that "rumors, conclusory allegations, and subjective beliefs . . . are wholly insufficient to establish a claim of [harassment] as a matter of law.") (internal citations omitted).

---

[4] Moreover, all of the comments Plaintiff references in her Complaint were conveyed to her second-hand and constitute double, if not triple, inadmissible hearsay.

Regardless, the evidence in the record, including Plaintiff's deposition testimony, clearly shows that Plaintiff not aware of any of these rumors until weeks after she had requested a transfer out of the IT Department and after she had already been notified of her transfer into a new workgroup. SOF ¶¶ 45, 47–57. Because Plaintiff was not aware of the allegedly offensive comments *while she was actually working in the IT Department*, it is entirely impossible for Plaintiff to have believed that she was subjected to a hostile work environment. *Wanchik*, 6 F. App'x at 262. Thus, Plaintiff cannot allege in good faith that she found her work environment subjectively harassing and, as a result, her claim fails as a matter of law.

### iii. *Even if the alleged harassment was true, it was not severe or pervasive enough to constitute a hostile work environment.*

Plaintiff's allegations of harassment are simply not severe or pervasive enough to establish a hostile work environment claim. To create an actionable hostile work environment claim, the hostility must be sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 486 (6th Cir. 2020). Conduct must be "extreme" to meet this standard. *Ault v. Oberlin Coll.*, 620 F. App'x 395, 400 (6th Cir. 2015) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "This standard sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect." *Khalaf*, 973 F.3d at 485–86.

In determining whether an environment is sufficiently severe and pervasive, "courts must consider the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance . . . ." *Strickland v. City of Detroit*, 2021 U.S. App. LEXIS 11934, at \*1 (6th Cir. Apr. 22, 2021). Generally, isolated incidents will not amount to discriminatory changes in a plaintiff's terms and conditions of employment. *Khalaf*, 973 F.3d at 486 (citing *Faragher*, 524 U.S. 775 at 788).

The "ordinary tribulations of the workplace, such as offhand comments, occasional teasing, or the sporadic use of abusive language or gender related jokes, do not amount to changes in the terms or conditions of employment. *Ault*, 620 F. App'x at 400 (citing *Faragher*, 524 U.S. at 788). "Occasional offensive utterances do not rise to the level required to create a hostile work environment . . . [t]o hold otherwise would risk changing [discrimination laws] into a workplace civility code[.]" *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008); *see e.g. Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011) (holding that multiple "despicable" statements that were "certainly insensitive, ignorant, and bigoted" did not constitute "severe or pervasive harassment given their isolated nature and their resemblance to a 'more offensive utterance'").

Courts have held that objectable and even physically assaulting behavior does not meet this standard. *See e.g. Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000) (affirming summary judgment in favor of the employer where the supervisor made two suggestive comments and also committed a potential battery against the plaintiff); *Clark*, 400 F.3d 341 at 352 (holding that where a supervisor told vulgar jokes, twice placed his vibrating pager on plaintiff's thigh, and pulled at her overalls after she told him she was wearing a thong, there did not exist a hostile work environment).

For example, the Sixth Circuit has found in several cases that sexual jokes, even coupled with the act of sexual battery or physical touching, was not severe or pervasive enough to survive summary judgment. *See e.g., Gwen v. Reg'l Transit Auth.*, 7 Fed Appx. 496, 502 (6th Cir. 2001); *Burnett*, 203 F.3d at 982; *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000); *Stacy v. Shoney's, Inc.*,1998 U.S. App. LEXIS 6659, at *1–3 (6th Cir. 1998). Clearly, Plaintiff's allegations do not meet the incredibly high standard for a hostile work environment. In this case, Plaintiff only claims that her coworkers made "inappropriate" comments about her and

her work performance, which she did not personally hear. Compl. at ¶ 10; SOF ¶47. Plaintiff admits that she was only aware of one instance of name-calling, i.e. when a female colleague called her a "bimbo." *Id.* Plaintiff also alleged that a colleague, Carlos Ortiz, told her that her colleagues made disparaging comments about her work and her job duties on at least two occasions, but Ortiz informed HR that those comments were made two to three years prior. SOF ¶ 48. Finally, Plaintiff generally refers to a rumor of unknown origin that she was having a romantic relationship with her supervisors. SOF ¶ 49–50.

As a matter of law, these few alleged isolated instances over a three year time period fail to meet the standard for severe or pervasive. *Gomes v. Prime Design, Inc.*, 85 F. App'x 421 (6th Cir. 2003) (holding that isolated acts by supervisors, including threats of undressing, calling female employees "bimbo," and references to employees "parts," did not create a sustained anti-female environment sufficient to establish sexual harassment); *Coulson*, 31 F. App'x at 852 (holding that "name-calling, alone, is not sufficient to create a hostile work environment"); *Larocque v. City of Eastpointe*, 245 F. App'x 531, 536 (6th Cir. 2007) (holding that comments based in "rumor and innuendo" are insufficient for establishing an objectively hostile work environment). Therefore, Plaintiff has failed to establish that she was exposed to conduct severe or pervasive enough to constitute a hostile work environment.

### iv. *The evidence does not support that Plaintiff was subject to unwelcomed sexual harassment based on her sex.*

Plaintiff has also failed to present any evidence that the alleged harassment was based on her sex. Sexual harassment is based on sex where, "but for the fact of her sex, [the plaintiff] would not have been the object of harassment." *Braun v. Ultimate Jetcharters, Inc.*, 2013 U.S. Dist. LEXIS 104277, at *31 (N.D. Ohio July 25, 2013) (holding that while a plaintiff "may have been subject to intimidation, ridicule, and mistreated by [male coworkers] . . . she [did] not show that

she was treated in a discriminatory manner because of her gender."). "Harassment based on sexual desire is harassment based on sex, and non-sexual conduct may be illegally sex-based where it evinces anti-female animus." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557 (6th Cir. 2021). Ultimately, "[h]arassment is based on sex when an employee is exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id*.

Courts have made clear "[p]ersonal conflict does not equate with discriminatory animus." *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342–43 (6th Cir. 1998), cert. denied, 119 S. Ct. 875 (1999). While it is clear that Plaintiff had an adversarial relationship with some of her colleagues, there is no evidence that they were prejudiced against her because of her sex. SOF ¶ 55. To the contrary, the record is very clear that Plaintiff's colleagues did not like Plaintiff because there was a rivalry between the Cincinnati office and the Miami offices. SOF ¶¶ 37–40. Plaintiff also admits that this behavior was not "a Jamie-targeted thing." SOF ¶ 39.

In fact, Plaintiff admits that Gallimore, who was also located in Cincinnati, was treated the same way and his inability to repair relationships with the Miami team was one of the reasons for his termination. SOF ¶ 39; Pl.'s Dep. 13:25-14:2; 45:23-46:8. Additionally, the evidence in the record also shows that Plaintiff's conflicts with her coworkers were related to their opinions that she was hard to work with because they didn't feel that she valued other peoples' ideas and wanted it "her way or the highway," and she inserted herself into technical decisions of other managers, when that was not her role. SOF ¶ 42. Thus, the record shows and Plaintiff herself states that her conflicts was based on non-actionable personal conflicts her co-workers, not her sex. SOF ¶¶37-40. As a result, she cannot establish a hostile work environment claim. *Barnett*, 153 F.3d at 342–43.

Furthermore, there is nothing about the word "bimbo" that is inherently discriminatory against women. *Gomes*, 85 F. App'x at 423 (holding that use of the name, "bimbo," is insufficient for establishing anti-female bias). In fact, this is supported by the fact that the employee who is alleged to have called Plaintiff a bimbo was another female Director in the IT Department. SOF ¶ 47; *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 591 (6th Cir. 2003) (noting that discrimination is less likely when the alleged discriminator is in the same protected class); *Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 307 (6th Cir. 2016) (noting a heightened standard for sexual harassment claims against females).  Thus, the single instance of Plaintiff being called a "bimbo" does not show that Plaintiff was harassed based on her sex.

 Regarding the rumor, infrequent and indirect comments about two coworkers having a romantic relationship does not implicate Plaintiff's sex more than it implicates Westfall's. *See Nathan*, 992 F.3d 557 (requiring one gender to be treated differently than the other to sustain a sexual harassment claim); *see also Duncan v. Manager, Dep't of Safety*, 356 F. Supp. 2d 1126, 1130 (D. Colo. 2003) (holding that "[r]umors of heterosexual intimacy will not ordinarily be considered gender discrimination because both men and women are victimized"). As both genders were implicated in the rumor and Plaintiff has not presented any evidence to suggest that the rumor arose only because she is a woman, the rumor does not support an inference of sex discrimination.

### v. Vitas took reasonable care in investigating and remediating the issues Plaintiff raised in her HR complaint.

Vitas took appropriate remedial measures in response to Plaintiff's hostile work environment complaint, and as a result, is not liable to Plaintiff on her hostile work environment claim. *See Faragher*, 524 U.S. at 780 (holding that "no liability should be found against the employer who had taken reasonable care" to mitigate an employee's complaints); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 769–70 (1998) (finding that employer "liability should attach only

if the employer either knew, or in the exercise of reasonable care should have known, about the hostile work environment and failed to take remedial action"). The plaintiff must show that an employer's response "manifested indifference or unreasonableness." *Bourini v. Bridgestone/Firestone N. Am. Tire, L.L.C.*, 136 F. App'x 747, 748 (6th Cir. 2005).

Generally, a response is adequate if it is "reasonably calculated to end the harassment." *Id.* (holding that an employer was not liable because it took prompt remedial measures in response to a plaintiff's complaint). An employer cannot be liable for sexual harassment where the company took prompt remedial measures and the employee failed to avail herself of them. *Fawns v. Ratcliff*, 1997 U.S. App. LEXIS 17206, at *1 (6th Cir. July 3, 1997) (holding that an employer was not liable for an employee's sexual harassment claim because, once notified of the employee's complaints, the employer disciplined the employees implicated in the substantiated claims).

To establish a *prima facie* case for the *Faragher-Ellerth* defense, an employer need only show that: "(a) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Stewart v. Trans-Acc, Inc.*, U.S. Dist. LEXIS 44414, at *26–27 (S.D. Ohio Apr. 25, 2011) (citing *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275). Employers satisfy the first prong by enforcing a sexual harassment policy that "at least "(1) require[s] supervisors to report incidents of sexual harassment; (2) permit[s] both informal and formal complaints of harassment to be made; (3) provide[s] a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide[s] for training regarding the policy." *Stewart*, 2011 U.S. Dist. LEXIS 44414 at *28. Under the second prong of the *prima facie* test, an employee has "a responsibility . . . to avail

17

themselves of the preventive and corrective measures created by their employer for their benefit." *Id.* at \*29.

In this case, Vitas had a well-established anti-discrimination and anti-harassment policy that was provided to all employees and employees received training on the policy. SOF ¶ 4. Under the policy, (1) supervisors are required to report incidents of sexual harassment; (2) employees can make formal or informal written and verbal harassment complaints to Vitas' HR Department; (3) employees can contact HR directly without having to alert their supervisors; and (4) all employees are required to complete a harassment training, which includes a review of Vitas' anti-harassment policy. *Id.*

While Plaintiff did not actually contact HR herself, as soon as Plaintiff raised her concerns to her managers, they immediately contacted HR, so an investigation could begin.[5] SOF ¶¶ 50–52. Minutes after receiving notice of Plaintiff's concerns from Westfall, HR Representative, Susan Phillips, took immediate action on Plaintiff's HR complaint by following up with Plaintiff via phone. SOF ¶52. In addition to conducting three extensive interviews with Plaintiff and requesting a written statement, Phillips interviewed at least four individuals in an attempt to discern whether there was any viability to Plaintiff's claims. SOF ¶¶ 53–54. Phillips took very detailed notes throughout her investigation and addressed every issue raised by Plaintiff. SOF ¶¶ 53-57.

Based on the information discovered in the investigation, Phillips could not substantiate that Plaintiff was harassed or subjected to a hostile work environment based on her gender, and determined that most of the allegedly offensive comments were made several years prior. SOF ¶ 55. Nevertheless, in her written investigative report, Phillips made various recommendations on

---

[5] Vitas CEO, Nick Westfall contacted HR immediately after learning of Plaintiff's concerns. Pl. Dep. 55: 9-13, 179: 7-10. When Plaintiff raised her concerns to Smith, he immediately instructed her to contact HR and stated that he'd have to elevate her concerns up his chain of command, which he did. *Id.*

how to promote a more collegial and professional work environment in the IT Department. SOF ¶ 56. As Plaintiff had already transferred out of the IT Department and was not working with her prior colleagues, Vitas reasonably determined that no additional action was needed to address Plaintiff's current work environment. SOF ¶ 47, 55–57. However, Philips even followed up with Plaintiff to assess whether Plaintiff had any ongoing or new concerns. SOF ¶ 57. Thus, even if Plaintiff had been subject to a hostile work environment, Vitas would not be liable because it had a policy in place to prevent harassment, employees were well trained on the policy, Plaintiff failed to notify Vitas that she had concerns about her work environment in the IT Department until she had already transferred, and Vitas took immediate action upon receiving notice of her concerns.

Ultimately, Plaintiff has failed to show that: (1) the alleged harassment she experienced constituted a hostile work environment; (2) she was subject to unwelcome sexual harassment based on her sex; and (3) Vitas failed to exercise reasonable care to prevent and correct any sexually harassing behavior in its workplace. Because there is no issue of material fact regarding Plaintiff's failure to make a *prima facie* case of hostile work environment, her sexual harassment claim fails.

### c.   Plaintiff's claims for retaliation under ORC 4112.02 fail as a matter of law.

Plaintiff's disability and sexual harassment retaliation claims fail as a matter of law because she fails to establish a *prima facie* case, Vitas had a legitimate non-discriminatory reason for her termination, and Plaintiff has no evidence of pretext. Retaliation claims under ORC 4112.02 are analyzed under the *McDonnell Douglas* burden shifting framework.[6] To establish a *prima facie* case of retaliation, Plaintiff must prove that: 1) she engaged in protected activity; 2) the exercise of her protected activity was known to the relevant decision-maker; 3) Plaintiff thereafter suffered

_____

[6] The scope of O.R.C. § 4112.02 is identical to that of federal anti-discrimination and anti-retaliation statutes. *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 421 N.E.2d 128, 131 (Ohio 1981).

an adverse employment action by Vitas; and (4) there was a causal connection between the protected activity and the adverse employment action." *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008) (citations omitted). If Plaintiff can establish a *prima facie* case of retaliation, the burden shifts to Vitas to articulate a legitimate, nondiscriminatory reason for the employment action. *Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 457 (6th Cir. 2007). The burden then shifts back to Plaintiff to prove Vitas' stated reason was pretext for retaliation. *Lefevers v. GAF Fiberglass Corp.,* 667 F.3d 721, 725 (6th Cir. 2012).

Here, Plaintiff's retaliation claims fail as a matter of law because: (1) she never engaged in a protected activity relating to disability; (2) the decision-maker did not know that she engaged in protected activity; (3) there was no causal connection between the protected activity and the adverse employment action; and (4) there is no evidence of pretext.

### i. *Plaintiff did not engage in protected activity on the basis of a perceived disability.*

First, Plaintiff's disability retaliation claim fails because she never engaged in protected activity related to her disability. An employee can engage in disability-related protected activity by (1) filing or assisting in the investigation of a complaint in opposition to an act in violation of disability discrimination law or (2) requesting, in good faith, an accommodation for a disability. *See Neely v. Benchmark Family Servs.*, 2015 U.S. Dist. LEXIS 52267, at \*24–25 (S.D. Ohio Apr. 20, 2015) (holding that a plaintiff did not engage in protected activity because they did not file a complaint or request an accommodation). In this case, Plaintiff admits that she never requested an accommodation or made a complaint to anyone at Vitas about disability discrimination. SOF ¶ 80.

While Plaintiff claims that she did tell her supervisor, Wysong, and other Vitas employees that she had a brain tumor, those communications are insufficient for establishing that Plaintiff engaged in legally protected activity. *See Barrett v. Lucent Techs.*, 36 F. App'x 835, 842 (6th Cir.

2002) (holding that "[w]hile a communication may be protected even if it is vague or inartful, a plaintiff must still articulate opposition to what she reasonably believes to be unlawful activity" to constitute protected activity); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015) (holding that a plaintiff must do more than just tell their supervisor about a potentially unlawful environment; they must have requested that the allegedly unlawful circumstance stop). For this reason alone, Plaintiff cannot establish a *prima facie* case of retaliation based on a perceived disability.

### ii. *Plaintiff's transfer to the High Acuity Department was not an Adverse Action or Retaliatory.*

As an initial matter, prior to her termination, Plaintiff did not suffer an adverse employment action because there was no material adverse effect on the terms and conditions of Plaintiff's employment. *See Weaver v. City of Twinsburg*, 580 F. App'x 386, 387 (6th Cir. 2014) (holding that an adverse employment action includes acts such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits, and usually inflicts direct economic harm"). An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id. See e.g. Campbell v. Univ. of Akron*, 211 F. App'x 333, 336 (6th Cir. 2006) (holding that "[a] written warning may be an adverse employment action only if it effects a significant change in the plaintiff's employment status"). In this case, Plaintiff did not suffer any change in pay, status, or benefits when she transferred from IT to the High Acuity Department. SOF ¶ 59. While her responsibilities changed, they were merely "an alteration of job responsibilities." *Weaver*, 580 F. App'x at 387.[7]

---

[7] To the extent the Plaintiff is alleging her negative performance evaluations were an adverse action, this is insufficient to establish an adverse action. *See also Jones v. Ohio State Univ.*, 2007 U.S. Dist. LEXIS 38717,

Not to mention, Plaintiff did not suffer an adverse employment action prior to her termination because her transfer out of the IT Department was voluntary. A voluntary transfer is not an adverse employment action, unless the conditions of the transfer are such that a reasonable person would find them objectively intolerable." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 920 (6th Cir. 2014). Generally, "[w]ork reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions." *Smith v. Cty. of Hamilton*, 34 F. App'x 450, 455–56 (6th Cir. 2002). In this case, Plaintiff initiated a meeting with her supervisors in the IT Department and requested to be transferred out to a new department. SOF ¶¶ 44–45. And, as discussed above, Plaintiff did not suffer any salary or work hour changes as a result of the transfer.

Moreover, it is important to note that Vitas could not have taken an unlawful adverse employment action against Plaintiff by transferring her to the High Acuity Department because, as Plaintiff admits, she did not engage in protected activity until *after* she was already transferred to the High Acuity Department. SOF ¶¶ 45, 47, 58. Thus, there is no causal connection nor direct evidence to support that Plaintiff suffered an adverse employment action when she transferred to the High Acuity Department. *See Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998) (holding that "[w]hen a plaintiff alleges retaliatory action that preceded her protected activity or request for disability accommodation, the plaintiff fails to state a claim that she was treated differently after the protected activity").

For these reasons, Plaintiff's claim that she suffered an adverse employment action prior to her termination fails. *Weaver*, 580 F. App'x at 390–392 (holding that a plaintiff failed to establish that they suffered an adverse employment action prior to their termination when the plaintiff made a voluntary employment decision).

---

at \*27 (S.D. Ohio May 29, 2007) (holding that poor performance evaluations alone cannot not form the basis of a retaliation claim unless they have an adverse impact on the plaintiff).

### iii. Plaintiff cannot establish a retaliation claim based on her termination because Wysong, the decision-maker, was not aware of Plaintiff's alleged protected activity when he decided to terminate Plaintiff.

Plaintiff's sexual harassment retaliation claim fails as a matter of law because it is undisputed that the sole decision-maker in her termination, Wysong, was not aware that Plaintiff engaged in protected activity at the time of Plaintiff's evaluations or termination. SOF ¶61. To establish a retaliation claim, a plaintiff must present direct or circumstantial evidence that the decision-making employee had knowledge of a plaintiff's protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552–53 (6th Cir. 2002). *See also Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 535–36 (6th Cir. 2013) (affirming summary judgment in favor of defendant-employer because plaintiff failed to raise a reasonable inference that the decision-maker had knowledge of the plaintiff's protected activity).

In this case, it is undisputed that Wysong was not aware of Plaintiff's concerns or complaints about discrimination or harassment. SOF ¶ 61. Additionally, the testimony is undisputed that Wysong, who was the sole decision-maker, did not consult with Hale, Smith, Westfall, or anyone else in the IT Department when deciding to terminate Plaintiff. SOF ¶ 71. For these reasons, there is no evidence to suggest that Plaintiff's HR complaint was a factor in his decision to terminate Plaintiff. As a result, her retaliation claim fails as a matter of law. *See Rumble v. Convergys*, 2009 U.S. Dist. LEXIS 125645, at *42 (S.D. Ohio Nov. 9, 2009) (finding that a plaintiff's retaliation claim failed because the plaintiff failed to prove that the decision-maker in their termination knew about their protected activity).

### iv. There is no causal connection between Plaintiff's protected activity and her termination over a year later.

Plaintiff cannot establish a *prima facie* case of retaliation based on her sexual harassment complaint because there is no causal connection between her sexual harassment complaint and her

23

termination. There is no temporal proximity between the protected activity and her termination. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 561 (6th Cir. 2000) (holding that a causal connection can be established via direct evidence or "temporal proximity" ("knowledge coupled with a closeness in time that creates an inference of causation")). Generally, a time lapse of more than four months between a plaintiff's protected activity and the alleged adverse employment action requires additional evidence of retaliation to meet the fourth prong of the *prima facie* test. *Cooper v. City of North Olmsted,* 795 F.2d 1265 (6th Cir. 1986) (holding that temporal proximity of four months was insufficient to establish temporal proximity); *Blosser v. AK Steel Corp.*, 520 F. App'x 359, 362 (6th Cir. 2013) (holding the same).

In this case, Plaintiff did not speak with HR regarding her concerns in the IT Department until October 23, 2017. SOF ¶¶ 51–52. Vitas terminated her over a year later on October 31, 2018. SOF ¶ 70. As there is no temporal proximity between Plaintiff's complaint and her termination, she must provide direct evidence of retaliation. *See Lewis v. Quaker Chem. Corp.,* 2000 U.S. App. LEXIS 22321 at *25 (6th Cir. Aug. 24, 2000) (holding that, in lieu of temporal proximity, "[the Sixth Circuit] has required some direct evidence establishing a causal connection"); *Nguyen*, 229 F.3d at 561 (holding that additional evidence of retaliation is required in the absence of temporal proximity). Plaintiff has not alleged any additional evidence of retaliation or any evidence to refute that Vitas terminated her for poor performance in the High Acuity Department. SOF ¶ 59, 61, 70, 78–80. Therefore, Plaintiff cannot establish a causal connection between her protected activity and her termination over a year later and retaliation claim fails as a matter of law.

### v. Plaintiff cannot refute Vitas' legitimate, non-retaliatory reason for terminating her employment.

Plaintiff cannot show that Wysong's decision to terminate Plaintiff for her continual performance issues was a pretext for retaliation. To establish that an employer's legitimate, non-

retaliatory reason is pretextual, a plaintiff must show by a preponderance of the evidence that: (1) the reason has no basis in fact; (2) the reason did not actually motivate the employment action; or (3) the reason was insufficient to motivate the employment action. Lefevers, 667 F.3d at 725.

First, Vitas had a legitimate, non-retaliatory reason for her discharge, i.e. poor performance. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 769–70 (6th Cir. 2015) (holding poor performance was a legitimate non-retaliatory reason for discharge); *Weaver*, 580 F. App'x at 393 (holding that defendant-employer's decision to terminate plaintiff for insubordination and poor performance was legitimate and non-retaliatory). Moreover, the decision to terminate Plaintiff based on her performance is clearly based on Wysong's reasonable opinion that Plaintiff was not performing her job duties as requested. SOF ¶ 67, 69–70. As Wysong meticulously documented in Plaintiff's counseling and performance review, Plaintiff failed repeatedly to meet her performance standards. SOF ¶ 67. Despite numerous counselings and opportunities to improve, Plaintiff continued to fail to follow instructions, deliver timely work product and communicate with her supervisors in advance regarding any problems meeting deadlines. SOF ¶ 64–70.

Second, Plaintiff has not presented any evidence of pretext. Plaintiff has not presented any evidence to challenge that Wysong's decision to terminate her for poor performance was inappropriate. Likewise, Plaintiff failed to present any evidence to support that Wysong was motivated by an unlawful reason. As a result, her retaliation claims fail as a matter of law. *See Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 81–83 (6th Cir. 2020) (upholding summary judgment in favor of defendant-employer because the plaintiff's poor performance reviews were based in fact, and the plaintiff failed to present any evidence that an illegal motivation influenced the termination); *Rumble*, 2009 U.S. Dist. LEXIS 125645, at *42 (S.D. Ohio Nov. 9, 2009) (holding that defendant-employer is entitled to judgment as a matter of law because the plaintiff

failed to present evidence that the employer's legitimate, non-retaliatory decision to terminate plaintiff for poor performance was pretextual).

Ultimately, Plaintiff cannot succeed on her retaliation claims because she has failed to establish a *prima facie* case of retaliation, Vitas had a legitimate, non-retaliatory reason for her discharge, and Plaintiff failed to establish evidence of pretext. Because there are no issues of material fact regarding Plaintiff's retaliation claims, they should be dismissed in their entirety.

### d. **Plaintiff's Public Policy Claim Fails Because Plaintiff is Not a Covered Employee Under O.R.C. § 4723.33.**

Ohio Rev. Code § 4723.33 provides protections against retaliation for "[a] registered nurse, licensed practical nurse, dialysis technician, community health worker, or medication aide" who makes a good-faith complaint about a violation of specified Ohio statutes. Plaintiff's positions at Vitas were Director of Portfolio Management until July 2016; Director of IT Solutions and IT Finance until the end of 2017; and Internal Management Consultant for High Acuity Services until her termination. SOF ¶¶ 10, 27, 58. At no point did Plaintiff work in a patient care position covered by § 4723.33. SOF ¶ 74. Thus, by the plain language of the statute and Plaintiff's own testimony, Plaintiff is not covered under § 4723.33 and Vitas is entitled to summary judgment on this claim.

Additionally, ORC § 4723.33 requires employees to comply with the reporting procedures in ORC §4113.51. ORC §4723.33; *Shingler v. Provider Servs. Holdings*, L.L.C., 2018-Ohio-2740, 2018 Ohio App. LEXIS 2949 (Ohio Ct. App., Cuyahoga County 2018). As explained below, Plaintiff failed to comply with the reporting requirements in ORC §4113.51, thus, her claim is barred. Even if Plaintiff were a covered employee under § 4723.33, her claim still fails as a matter of law because: (i) she cannot demonstrate any causation between her complaint and her termination; and (ii) Vitas had a legitimate, non-retaliatory reason for her termination and there is

no evidence as pretext, as described in Sections III(C)(v) of this Memorandum. For these reasons, Plaintiff's retaliation claim fails as a matter of law.

      **e.**   **Plaintiff Cannot Prove a Claim Under the Ohio Whistleblower Act Because O.R.C. § 4113.51 Does Not Protect Plaintiff's Actions and Plaintiff Cannot Prove Retaliation.**

Plaintiff cannot establish a claim under the Ohio Whistleblower Act ("OWA") because her alleged complaints were not about criminal acts, and because she cannot show any causal connection between the alleged complaints and an adverse employment action.

The OWA protects individuals from retaliation for complaining to their employer about:

> a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution.

Ohio Rev. Code § 4113.52(A)(1)(a). To satisfy the statute, an employee must complain to a supervisor orally and in writing and give the employer 24 hours to attempt to remedy the alleged criminal violation before complaining to a prosecuting authority, a peace officer, inspector general or another public official or agency. *Id.* If an employee fails to follow each of these requirements — oral report to a supervisor, followed by a written report to a supervisor, and finally a report to outside authorities — the employee is not entitled to any whistleblower protection under the statute. *Id.*; *see also Hill v. Mr. Money Financial Co.*, 491 F. Supp. 2d 725, 733 (N.D. Ohio 2007).[8]

If an employee meets these notice requirements, an employer is prohibited from retaliating against the employee via termination or other adverse employment actions. *Id.* at § 4113.52(B). To establish a prima facie case of retaliation under the OWA, a plaintiff must show a causal

---

[8] *Id.* ("[T]o be protected under [the OWA] the plaintiff must have filed 'a written report . . . with the proper prosecuting authority or other appropriate official or agency with regulatory authority over the employer and the industry, trade or business in which the employer is engaged.'")

connection between her complaint and an adverse employment action. *Klepsky v. UPS*, 2005 U.S. Dist. LEXIS 21395 at \*18–19 (N.D. Ohio Sep. 27, 2005). Ohio courts routinely decline to find a causal link between an employee's complaint and an adverse employment action when the temporal proximity between the two events is four months or more. *Id.* at \*19 (quoting *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)).

Plaintiff's Complaint alleges that Vitas retaliated against her by terminating her after she complained about Vitas "accepting patients in order to maximize income even without the proper facilities, personnel, or ability to treat them properly . . ." ("Staffing Complaint"). (Compl. ¶ 14). Plaintiff further states that she made this complaint via email in 2018, although she does not remember the date and the email was not provided.[9] SOF ¶¶ 72–73, 75; Pl. Depo. 164, 303. Plaintiff testified that the Staffing Complaint was related to what she perceived to be inadequate staffing levels for continuous care based entirely on anecdotal statements. These states came from a newly-hired continuous care manager in Texas who was feeling overwhelmed about the number of new patients being admitted in her region because she was not able to *immediately* dispatch staff to take over hospice care.[10] SOF ¶ 75, 77; Pl. Depo. 159–160. Plaintiff does not allege that the Vitas' action violated any law, regulation, or standard of care, or that the perceived temporary delay actually placed any patient seeking hospice care in any risk of imminent harm.

Additionally, during discovery, Plaintiff also alleged that she orally complained about the Company's failure to remedy overspending related to travel and entertainment expenses ("Budgetary Complaint").[11] SOF ¶ 72. Plaintiff's alleged Budgetary Complaint occurred no later

---

[9] As noted above, Plaintiff was not directly involved in patient care or hiring patient care professionals. Her primary job duties were related to IT training for employees in Florida.

[10] "Continuous care" refers to hospice care for patients who require around-the-clock care. "High acuity" refers to patients in continuous care who are in a period of crisis requiring a higher level of care.

[11] Plaintiff's Complaint does not allege that her Budgetary Complaint was the basis for her Whistleblower retaliation claim, meaning that Plaintiff is barred from raising this claim to defeat a summary judgment

than the end of 2017, when she transitioned to the High Acuity team. (Pl. Depo. 302). Plaintiff acknowledged that she did not believe her Budgetary Complaint to be related to a statutory or criminal violation. SOF ¶ 73.

Here, Plaintiff's claim cannot survive Vitas's Motion for Summary Judgment because the record proves that Plaintiff did not reasonably believe that either complaint involved a criminal violation or an imminent threat to health or safety. Plaintiff's deposition testimony regarding the Budgetary Complaint plainly reflects Plaintiff's belief that Vitas's actions did not constitute a crime. (Pl. Depo. 146–147). Moreover, there is no evidence on the record that Plaintiff reasonably believed her Staffing Complaint concerned a criminal violation or an imminent threat to health or safety—her Complaint fails to allege such a belief, and Plaintiff did not state such a belief anywhere in her discovery responses or deposition testimony. As a result, her OWA claim fails on this basis alone. *See Youngblood v. Bd. of Comm'rs*, 2021 U.S. App. LEXIS 4482 at \*8 (6th Cir. 2021) (affirming dismissal of plaintiff's OWA claim because "nothing in [plaintiff's] complaint suggests that she believed the alleged misconduct she reported was a criminal offense . . . ."); *Lesko v. Riverside Methodist Hosp.*, 2005 Ohio App. LEXIS 2912 at \*20 (Ohio App. Jun. 23, 2005) ("[B]ecause appellant did not demonstrate that she had a reasonable belief in a criminal offense, appellant's claims pursuant to R.C. 4113.52 fail as a matter of law.").

Moreover, Plaintiff's claims fail as a matter of law because she did not strictly follow the requirements of the statute to file an oral report, followed by a written report, and finally a report to outside authorities. *Hill*, 491 F. Supp. 2d at 733 (dismissing OWA claim because "[Plaintiff] did not file a [report] with the FTC until after he was fired.").[12]

---

motion. Nonetheless, Vitas addresses the merits of this claim here because Plaintiff conflated these issues during her deposition.

[12] *See also Janezic v. Eaton Corp.*, 2013 Ohio LEXIS 210, at \*10 (Ct. Comm. Pl. 2013) (dismissing a claim for failure to complain to an agency).

Furthermore, Plaintiff's whistleblower claims fail for the same reason as her retaliation claims under §4112.02,[13] i.e. there is no evidence of causation or pretext, and Vitas had a legitimate non-retaliatory reason for her termination. Plaintiff's complaints occurred respectively in late 2017 and early 2018, meaning that the time between her complaints and her termination does not support an inference of retaliation.[14] Because Plaintiff's termination occurred nearly seven months after the latter of her two complaints, by law Plaintiff cannot show a causal connection between the complaints and her termination. *Cooper*, 795 F.2d at 1272. Accordingly, no reasonable person could conclude that Plaintiff's termination was the result of retaliation, and Vitas is entitled to judgment as a matter of law.

## III.    CONCLUSION

For the reasons explained above, there is no genuine dispute of material fact and Defendant is entitled to summary judgment on all claims as a matter of law. Vitas respectfully requests this Court to grant its Motion for Summary Judgment in its entirety, enter judgment in its favor, and grant such relief as the interests of justice may require.

Respectfully submitted,

*s/ Faith C. Whittaker*
Faith C. Whittaker (0082486)
Hayley L. Geiler (0097972)
Gregory A. Harrison (0029814)
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Phone: (513) 977-8200
Fax: (513) 977-8141
greg.harrison@dinsmore.com

---

[13] *See discussion supra* in Section III(C)(v) of this Memorandum.
[14] Based on Plaintiff's testimony that Wysong's "demeanor changed" toward her after the Staffing Complaint, it can be inferred that the Staffing Complaint occurred before April 2, 2018, when Plaintiff was first counseled for tardiness. Pl. Depo. 163, 172–174; Exh. 8.

faith.whittaker@dinsmore.com
hayley.geiler@dinsmore.com

*Attorneys for Vitas Hospice Services, L.L.C.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** was served by electronic mail using the Court's CM/ECF system on all counsel or parties of record.

This 10th day of May, 2020.

*s/ Faith C. Whittaker*
Faith C. Whittaker (0082486)

*Counsel for Defendant Vitas Hospice Services, L.L.C.*

21626720.2